IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


ROBERTA. KELLY and D. LAWRENCE OLSTAD,

                    Plaintiffs,

        v.

U.S. BANK; BISHOP, WHITE & MARSHALL, P.S., a Washington Professional Services Company; and KRISTA WHITE,

        Defendants.

_____

U.S. BANK NATIONAL ASSOCIATION,

           Third-party Plaintiff,

Civ. No. 08-1421-AC

FINDINGS AND RECOMMENDATION

FINDINGS AND RECOMMENDATION     1                             {KPR}

CITY OF PORTLAND, a municipal
corporation; MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC., an
inactive Oregon corporation; CREDIT
CARD RECEIVABLES FUND
INCORPORATED, an Ohio corporation dba
UNIFUND CCR PARTNERS; ZB
LIMITED PARTNERSHIP, a Delaware
limited partnership dba UNIFUND CCR
PARTNERS,

                    Third-party Defendants.
_____

ACOSTA, Magistrate Judge:

        This disposition addresses three motions filed by Defendant U.S. Bank ("U.S. Bank"): U.S.

Bank's Motion for Summary Judgment (#51); U.S. Bank's Motion for Summary Judgment –

Foreclosure Claim (#94); and U.S. Bank's Motion to Strike (#129).  The court will first address the

motion to strike and then proceed to the motions for summary judgment.

## U.S. BANK'S MOTION TO STRIKE

### *Introduction*

        U.S. Bank moves to strike the bulk of Plaintiffs Roberta A. Kelly ("Kelly") and D. Lawrence

Olstad's ("Olstad") (collectively "Plaintiffs") evidentiary submissions related to U.S. Bank's motions

for summary judgment.  Plaintiffs submitted four sets of documents in support of their opposition

to U.S. Bank's motion:  Appendix A, Exhibits, exhibits attached to its supplementary response

("Exhibits to Supplement"), and exhibits submitted at hearing[1] ("Hearing Exhibits").  U.S. Bank

objects to the admission of the majority of Plaintiffs' exhibits on the grounds that they are either

---

[1] At the hearing on this matter, Plaintiffs submitted additional exhibits to the court. The court
accepted the exhibits and U.S. Bank extended the objections it had made to the other exhibits
submitted prior to hearing.

inadmissible declarations, unauthenticated documents, contain inadmissible hearsay, are otherwise irrelevant, or some combination thereof. As a preliminary matter, although the caption of U.S. Bank's motion to strike refers to striking an appendix, the motion and memorandum do not address the contents of Appendix A. Accordingly, the court will not address the admissibility of its contents except to the extent that the contents are relevant to disposition of the motions for summary judgment and are addressed therein.

I.      Inadmissible Declarations

        U.S. Bank moves to strike the declarations of Mona St. Clair ("St. Clair"), Terrence Rickard Stark ("Stark"), Shirley A. Guy ("Guy"), and Kelly on the grounds that the declarants are not competent to testify as to the content of the declarations, lack personal knowledge of that which they declare, and, in Kelly's case, that the declaration does not contain specific facts that would be admissible at trial. A declaration or affidavit is admissible for summary judgment purposes where such declaration or affidavit is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the [declarant or] affiant is competent to testify on the matters stated." FED. R. CIV. P. 56(e).

        A.      *St. Clair Declaration*

        In her declaration, St. Clair states that she has been a licensed real estate broker for two years and worked previously, for thirteen years, as a legal assistant to an attorney, her husband, whose practice focuses on real estate. (St. Clair Declaration ("Decl.") ¶ 1, 2.) As a result, St. Clair states that she "h[as] been personally and professionally interested in, and keeping aware of developments in, the real estate market in the Portland, Oregon area for approximately 15 years." (St. Clair Decl. ¶ 3.) St. Clair was the "seller[']s realtor" on the sale of 5109 N.E. Ainsworth St., Portland, Oregon

("the residential property").  Regarding the subject property, St. Clair stated that the property would have sold for between $400,000 and $450,000 in 2007, but would likely sell only for approximately $295,000 in the current real estate market.  She also testified as to her belief that the property has decreased in value due to a "housing bubble[.]"  (St. Clair Decl. ¶ 7.)

U.S. Bank argues that this declaration is inadmissible because St. Clair lacks competency to testify as to the operation of the real estate market as a whole.  Referring to St. Clair's stated credentials, U.S. Bank writes:  "mere interest does not create competency."  (Motion 3.) Furthermore, St. Clair lacks personal knowledge and a factual basis sufficient to support a broad conclusion about the real estate market.  U.S. Bank admits that St. Clair has personal knowledge of the local real estate market and the property itself and does not object to that testimony. Accordingly, the court does not strike that portion of the declaration, specifically paragraphs 5 and 6.  The court agrees, however, that St. Clair lacks competency to testify as to the reason underlying the decrease in value of the subject property and, thus, strikes the conclusions contained in paragraph 7.

B.    *Stark Declaration*

Stark is a former mortgage banker of thirty years who currently "make[s] private loans with [his] own assets."  (Stark Decl. ¶¶ 1-4.)  His declaration states that, in the early 2000's, he noticed that the loan application process was becoming less stringent, requiring fewer qualifications and less documentation.  (Stark Decl. ¶ 5.)  In Stark's opinion, it was readily apparent that many of the loans issued during this time period would default.  (Stark Decl. ¶ 7.)  Even so, homes appreciated steeply and "[a]t the height of the bubble, homes that had been worth $120,000.00 before were selling for $500,000.00 to $750,000.00."  (Stark Decl. ¶ 8.)

FINDINGS AND RECOMMENDATION        4                                {KPR}

U.S. Bank objects that this declaration is inadmissible because it was unsworn, does not

contain facts admissible at trial, and that Stark is not competent to testify as to the substance therein.

The court agrees that the declaration is inadmissible on the first two grounds.   An affidavit is, by

definition, a statement taken under oath.   *See* BLACK'S LAW DICTIONARY 66 (9th ed. 2009)

(defining affidavit as "[a] voluntary declaration of facts written down and sworn to by the declarant

before an officer authorized to administer oaths.").   As this court wrote previously with respect to

the swearing of declarations:

> While Rule 56 refers specifically to affidavits, a party may also offer unsworn
> declarations in support of a motion for summary judgment provided the declarations
> comply with the requirements of 28 U.S.C. § 1746.   Section 1746 requires that an
> unsworn declaration executed within the United States include language that "I
> declare (or certify, verify, or state) under penalty of perjury that the foregoing is true
> and correct," as well as the date on which the declaration was executed.

*Kesey v. Francis*, No. CV. 06-540-AC, 2009 WL 909530, at *6 (D. Or. Apr. 3, 2009) (citing 28

U.S.C. § 1746 (2007)).

The Stark Declaration includes no language indicating that it was made under penalty of

perjury or otherwise attesting to its truth and, thus, is inadmissible.   Furthermore, the content of the

declaration lacks specific facts that would be admissible at trial.   Stark's testimony addresses, in very

broad terms, the operation of the mortgage industry over the course of the last decade.   The

testimony lacks any specific and fact-based connection to Plaintiffs, the subject property, or the

claims in this case.   Therefore, the Stark Declaration does not contain admissible evidence and is

stricken.

C.      *Guy Declaration*

Guy is a "Branch Manager and Certified Senior Escrow Officer with Fidelity National Title

Company." (Guy Decl. ¶ 1.) Guy states that she has twenty years of experience and has closed

hundred or thousands of loans "in which the documents contained references to MERS." (Guy Decl.

¶ 3.) Attached to the declaration is a MERS disclosure form and Guy testifies as to her opinion that

MERS is "only an electronic registry system the purpose of which is to track liens in order to

facilitate rapid and repeated transfers of lien interests in real estate mortgages without compliance

with official recordation requirements." (Guy Decl. ¶ 5.) The attached disclosure statement states,

in part: "Your lender has elected to name MERS as the mortgagee in a nominee capacity and record

the mortgage in the public land records to protect its lien aganst your property. **Naming MERS as**

**the mortgagee and registering the mortgage on the MERS electronic tracking system does not**

**affect your obligation to your Lender, under the Promissory Note.**" (Guy Decl. 3 (emphasis in

original).)

      The court agrees that Guy's opinions about the operation of MERS are not admissible

because Guy has neither the personal knowledge nor the compentency to testify as to the structure

and operation of MERS. Guy also attached a MERS disclosure form to her sworn affidavit. This

document, however, lacks sufficient indicia of reliability to allow the court to admit it for its truth.

It appears to be a disclosure form with the fields that would typically identify the borrower and the

property left blank. In the lower left-hand corner, the document is labelled "MERS Disclosure

Statement, 1D542-US (09/06) (d/l)." (Exhibit ("Ex.") 5 at 3.) That information notwithstanding,

there is no way to verify that this disclosure form was ever used, if it is currently used, or if it was

used in conjunction with Kelly's loan transactions. Accordingly, the Guy declaration and the

disclosure form are both stricken.

//

D.    *Kelly Declaration*

In her declaration, Kelly first describes her role in the real estate industry. This information is based on personal knowledge and admissible. However, the balance of the declaration is composed entirely of unsupported allegations and conclusory statements, none of which are admissible as a factual basis for Kelly's position. Accordingly, paragraphs 2-7 of the Kelly Declaration are stricken.

II.    Relevance

The Federal Rules of Evidence define "relevant evidence" as: "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EV. 401. This definition gives rise to the simple rule that, in general, "[all] relevant evidence is admissible . . . [and] [e]vidence which is not relevant is not admissible." FED. R. EV. 402.

A.    *Documentary Exhibits*

The bulk of the exhibits currently before the court, those submitted by Plaintiffs, fail to gain admission on relevance grounds. Plaintiffs submit several articles and transcripts of testimony from a variety of sources that address generally the state of the economy, banking practices, securitization, mortgage-backed securities, and the recent financial crisis. Although Plaintiffs' allegations do reference and, at times, rely on these larger economic issues, Plaintiffs specific claim against U.S. Bank, as it relates to securitization and the financial crisis, is that the securitization of Kelly's residential mortgage by U.S. Bank prevents U.S. Bank from exercising its power of sale and foreclosing on her residential property. The substance of that claim will be addressed below in the disposition as to the motions for summary judgment. That said, in applying the standard of relevance

to Plaintiffs' evidence, the court will admit only evidence that tends to show that the facts related to that very specific claim are more or less probably true. In many, if not all cases, the articles and transcripts offered by Plaintiffs have no bearing on the facts of the specific claim against U.S. Bank. While the court is mindful of the larger systemic issues that arguably plague the mortgage industry and the economy as a whole, the court may only admit evidence that is relevant to U.S. Bank's liability under the facts of this case.

The following exhibits are deemed not relevant on the above basis and are, accordingly, not admitted for purposes of summary judgment. From the set of documents "Exhibits" the following are inadmissible as not relevant: Exhibit 1, a Washington Post article entitled "Pressure at Mortgage Firm Led to Mass Approval of Bad Loans"; Exhibit 7, testimony given to the "Before the Financial Crisis Inquiry Commission" by Julie Gordon, Senior Policy Counsel at the Center for Responsible Lending on January 13, 2010, which generally addresses the financial crisis; Exhibit 11, an article from the New York Times about bond-rating agencies, entitled "Triple-A Failure"; Exhibit 12, an article from BBC News about the dangers of derivatives in the financial system, entitled "Buffett warns of investment 'time bomb'"; Exhibit 13, three articles from The Australian, The Guardian, and Bloomberg.com about AIG and Tim Geithner; Exhibit 15,[2] a Bloomberg.com article about banking problems after the collapse of Lehman Brothers, entitled "Stiglitz Says Banking Problems Are Now Bigger Than Pre-Lehman"; Exhibit 16, a Stanford Journal of Law, Business & Finance article about asset securitization which appears to have been originally published in the 1990's; Exhibit 17, an article from an unidentified source entitled "Failure of Central Banking leads to Debt

---

[2] This exhibit is actually labeled as Exhibit 16, but is found between Exhibit 14 and another Exhibit 16, so the court refers to it as Exhibit 15.

Capitalism Self Destruction"; Exhibit 18, an article about asset securitization from the website engdahl.oilgeopolitics.com, entitled "The Financial Tsunami Part IV:  Asset Securitization – The Last Tango"; Exhibit 19, an excerpt from the book "It Takes a Pillage:  Behind the Bailouts, Bonuses, and Backroom Deals from Washington to Wall Street" by Nomi Prins; Exhibit 21, an article from newdeal20.org about the difference between the "financial" and "real" economies, entitled "How the Servant Became a Predator:  Finance's Five Fatal Flaws"; Exhibit 22, a McClatchy article about ratings agencies entitled "How Moody's Sold its ratings – and sold out investors"; Exhibit 23, entitled "Agency Financial Report," and issued by the United States Department of the Treasury, Office of Financial Stability which purports to "describe[] the activities and financial results for the Troubled Asset Relief Program[.]"

From the set of documents "Exhibits to Supplement" the following are inadmissible as not relevant:  Exhibit to Supplement 1, an article published on the American Bar Association's website entitled "Mortgage Securitization, Servicing, and Consumer Bankruptcy"; Exhibit to Supplement 2, an article published by CCH, an unidentified entity, entitled "The Subprime Lending Crisis:  Causes and Effects of the Mortgage Meltdown"; Exhibit to Supplement 3, an article published online at www.newdeal20.org entitled "How the Servant Became a Predator:  Finance's Five Fatal Flaws"; Exhibit to Supplement 8, an article by Steven Schwarcz, a law professor at Duke University, entitled "The Limits of Lawyering:  Legal Opinions in Structured Finance," about the liability issues lawyers face in issuing legal opinion letters in the area of finance; Exhibit to Supplement 9, comprised of a press release and two articles about U.S. Bancorp Piper Jaffray's expansion to include the trading of mortgage backed securities; Exhibit to Supplement 10, an article published by two authors, one of the Federal Reserve Bank of St. Louis and the other a professor in the Department of Finance at

NYU's Stern School of Business, entitled "Understanding the Subprime Mortgage Crisis"; Exhibit to Supplement 11, an article authored by Ellen Brown and printed from the website www.huffingtonpost.com, entitled "AIG Gate: The World's Greatest Insurance Heist"; Exhibit to Supplement 12, an article that appears to be titled "Here's The Untold Story Of How AIG Destroyed Itself," printed from the website www.businessinsider.com; Exhibit to Supplement 13, an article entitled "The 2007 HMDA Data," where the HMDA is the Home Mortgage Disclosure Act of 1975, the source of this article is unclear; Exhibit to Supplement 14A, a transcript of testimony before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on September 26, 2007, given by Chris Cox, Chairman of the Securities and Exchange Commission and entitled "Testimony Concerning Credit Rating Agencies"; Exhibit to Supplement 14, an article printed from www.mcclatchy.com, entitled "How Moody's sold its ratings - and sold out investors," which describes how the credit rating agency altered its ratings practices to stay competitive in the marketplace and increase profits; Exhibit to Supplement 15, a news digest published on the Securities and Exchange Commission website, one section of which describes a variety of enforcement proceedings undertaken by the SEC against investment firms as well as specific investment bankers; Exhibit to Supplement 17 is a press release from U.S. Bancorp entitled "Principal Real Estate Investors and U.S. Bank Join Forces in CMBS Market," and describes U.S. Bancorp's entry into the mortgage-backed securities market; Exhibit to Supplement 18, an article published by the Securities Litigation and Consulting Group, Inc., in 2007, entitled "The Law of Conservation of Structured Securities Risk"; Exhibit to Supplement 19, an article printed from an online source, www.startribune.com, entitled "Bad loans hinder U.S. Bancorp"; Exhibit to Supplement 20, an excerpt of an online publication of the Federal Reserve called the "fedgazzette,"

entitled "Why all concerns about subprime lending are not created equal," the article, published in 1999, describes the concerns of some about the emerging practice of subprime lending; Exhibit to Supplement 21, a document produced by Tavakoli Structured Finance, Inc., entitled "Wall Street's Fraud and Solutions for Systemic Peril" and identified as "TSF Opinion Commentary"; Exhibit to Supplement 22, an article printed from an online source, www.bizjournals.com, entitled "Federal Home Loan Bank seeks to recoup securities investment; $3.9 billion in mortgage suits filed[,]" about a lawsuit filed by a Seattle bank against several financial firms for allegedly making false and misleading statements when selling the bank mortgage-backed securities; Exhibit to Supplement 23, an article published by Wiley Press entitled "Wall Street Lies Blame Victims to Avoid Responsibility for Financial Meltdown," excerpted from the book, "It Takes a Pillage: Behind the Bailouts, Bonuses, and Backroom Deals from Washington to Wall Street"; Exhibit to Supplement 24, an article printed from an online source, www.guardian.co.uk, entitled "Former Wall Street Financiers face criminal action."

From the set of documents "Hearing Exhibits" the following are inadmissible as not relevant: Hearing Exhibit 16, an Associated Press article about an insurer, Woodmen of the World, suing U.S. Bank for investing and losing its money in mortgage-backed securities; Hearing Exhibit 19, an article authored by Ellen Brown regarding the allegations of fraud against Goldman Sachs and the emerging financial crisis in Europe, posted on www.globalresearch.com; Hearing Exhibit 20, an article by Eliot Spitzer about the Federal Reserve and its transparency, posted on www.globalresearch.com; Hearing Exhibit 21, apparently a blog entry detailing an interview with Ellen Brown about Goldman Sachs, posted on www.maxkeiser.com; finally, Hearing Exhibit 22 is another online article that asserts a theory that the death of Senator Paul Wellstone was an assassination.

In summary, the following documentary exhibits are stricken as not relevant:  Exhibits 1, 7, 11-13, 15-19, 21-23; Exhibits to Supplement 1-3, 8-24; and Hearing Exhibits 16, 19-22.

B.    *Video Exhibit*

At hearing, Plaintiffs also submitted a digital video disc ("DVD") which contains four video excerpts, Parts One though Four.  Part One is an excerpt from the testimony of William Black ("Black") before the House Financial Services Committee.  Black is a professor at the University of Missouri, in the areas of law and economics, and was formerly the Litigation Director for the Federal Home Loan Bank Board.  He testifies about allegedly fraudulent activities taking place at Lehman Brothers and the need for regulatory agencies to impose and enforce more stringent regulations. Black's testimony is not relevant to the current matter.  His testimony does not refer to any of the parties to this action, nor does it refer to the specific facts of the case.  Accordingly, this portion of the exhibit is stricken.

Parts Two through Four comprise a single web broadcast in three parts.  The show is titled "On The Edge with Max Keiser" and is produced by a website called "Press TV."[3]  The title given by Plaintiffs to the excerpt identifies the date of broadcast as February 26, 2010.  The first part of the broadcast is an interview with a woman named Stacey Herbert who reports that bonuses and profits on Wall Street continue to increase while those same banks are decreasing lending.  In a similar vein, Herbert states that the number of failing banks is also on the rise and those banks continue to decrease lending as well.  The second part of the broadcast is an interview with Ellen Brown ("Brown"), the author of "Web of Debt."  In the interview, Brown advocates for an increase in federal spending in light of current economic conditions.  She also posits that both federal and

_____

[3] The URL is http://www.presstv.ir/

state governments would benefit were they to borrow from public entities rather than private banks. Again, the information contained in this evidentiary offering is not relevant to the present matter. The content of this web broadcast does not refer to any of the parties to this action, nor does it refer to the specific facts of the case. Accordingly, the contents of the DVD are stricken.

   *C. Legal Sources*

   Hearing Exhibit 17, an official court document, is self-authenticating and, to the extent it is relevant is admissible. The case stands for the proposition that prior to actual assignment of a mortgage, an entity may not exercise the power of sale and foreclose on a property, even if the entity expects to receive the mortgage by assignment, and does, after the sale occurs. The court admits Exhibit 17 to the extent that it is applicable to the motions for summary judgment, but notes that it is a Massachusetts state case based on Massachusetts state law and, thus, does not have binding effect on this court.

   Hearing Exhibit 18 is a 1998 article originally printed in a law journal and reproduced under the title "Article – Revisiting Mortgage Assignments – Real Property Law Section 275." (Hearing Exhibit 18 at 1.) The article addresses a provision of New York law which allows a "borrower to compel an assignment of a mortgage when it exercises its right of redemption prior to bidding at the auction sale." *Id.* The court's review of the exhibit reveals that the article concerns New York state law and its content has no bearing on the facts or disposition of this case. Accordingly, the exhibit is not relevant and is stricken.

III. <u>Unauthenticated Exhibits</u>

   To be admissible, an exhibit must be properly authenticated. *See Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. ) ("A trial court can only consider admissible evidence in ruling on a

motion for summary judgment[,]" and authentication is a prerequisite for admissibility.). Under the Federal Rules of Evidence ("FRE"), the authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EV. 901(a). FRE 901(b) gives ten examples of extrinsic evidence that may authenticate an exhibit. The authentication requirement is also satisfied, without any extrinsic showing, by exhibits that are self-authenticating under FRE 902. Such exhibits include public records, newspaper or magazine articles, and other documents with built-in indicia of reliability. FED. R. EV. 902(1)-(10).

U.S. Bank argues that several of Plaintiffs' exhibits are not properly authenticated. U.S. Bank contends that Plaintiffs' exhibits are not attached to an authenticating affidavit or declaration or otherwise authenticated by extrinsic evidence and thus they must be self-authenticating under FRE 902 in order to be admissible.

U.S. Bank is correct that Plaintiffs have attached neither an authenticating declaration nor other extrinsic evidence that would tend to authenticate Plaintiffs' exhibits. Accordingly, the proffered exhibits must be self-authenticating and otherwise admissible to be admitted for purposes of summary judgment. The court will address the remaining exhibits, those not already stricken for lack of relevance, that U.S. Bank claims are not self-authenticating.

A.    *Exhibits*

Exhibit 2 is a Preliminary Report from Fidelity National Title Company of Oregon dated January 19, 2010. This document shows the assignment of U.S. Bank's junior interest in the residential property, i.e., the second mortgage, to MERS. As a preliminary report that is neither a public document nor executed in a manner such that it is authorized by law or otherwise certified, this report is not self-authenticating and is stricken.

FINDINGS AND RECOMMENDATION          14                              {KPR}

Exhibit 3 is titled "Bargain and Sale Deed" and represents a conveyance of title in the subject property from Plaintiff Kelly to herself and Plaintiff Olstad as tenants in common. This document, however, is "accompanied by a certificate of acknowledgment executed . . . by a notary public . . ." and is therefore self-authenticating. This exhibit is thus properly authenticated and admissible.

Exhibit 8 is a court document filed in the Eastern District of New York in the matter of *United States v. Butler*, 08-CR-370, entitled "Sentencing Statement of Reasons Pursuant to 18 U.S.C. § 3553(c)(2) [EXCERPTS]." (Plaintiffs' Exhibit ("Pls.' Ex.") 8 at 1.) The content concerns, generally, an investment banker who was convicted of fraud, and sentenced to a term of imprisonment and assessed fines of over $5 million. Although this court filing is a public document, it is not presented by Plaintiffs in such a way as to be self-authenticating and is not presented in its entirety. Thus, Exhibit 8 is not authenticated and is stricken.

Exhibit 9 is entitled "Trustee's Notice of Sale" and it notices the sale at auction of the subject property to occur on November 12, 2008. Like Exhibit 3, this document is accompanied by a certificate of acknowledgment of a notary public and is, thus, self-authenticating and is admissible.

Exhibit 10 is a document printed from the internet representing the complaint in the matter of *Securities and Exchange Commission v. U.S. Bancorp Piper Jaffray Inc.* (no case number is apparent). The internet address at the top of the document indicates that it was printed from the web site sec.gov. Despite the fact that this document appears to be public in nature, "[p]rintouts from a web site do not bear the indicia of reliability demanded for other self-authenticating documents under [FRE] 902. To be authenticated, some statement or affidavit from someone with knowledge is required[.]" *In re Homestore.com, Inc. Securities Litigation*, 347 F. Supp. 2d 769, 782 (W.D. Cal. 2004). Again, this exhibit lacks an authenticating affidavit and, because a printout from a website

is not self-authenticating, this exhibit is stricken.

Exhibit 14 is an undated solicitation from U.S. Bank Consumer Finance encouraging mortgage brokers to do business with U.S. Bank. This exhibit contains no indicia of authenticity and, thus, is stricken.

Exhibit 20 is a table entitled "US Bank Derivative Exposure," which lists as its source "FDIC/IRA Bank Monitor." This document is not authenticated in any way and is stricken.

B.      *Exhibits to Supplement*

Exhibit to Supplement 4 reproduces the first four pages of the "MERS ® Commercial Legal Primer," a document containing over 136 pages. The exhibit carries no indicia of authenticity and is otherwise not self-authenticating and, therefore, is stricken.

Exhibit to Supplement 7 appears to be a 1998 "Registration Rights Agreement" between New Century Financial Corporation and U.S. Bancorp. The document contains no indicia of authenticity and is otherwise not self-authenticating and, therefore, is stricken.

*Conclusion*

For the reasons stated, the court strikes, in whole or in part, the following exhibits: Exhibits 1, 2, 5-8, and 10-23; Exhibits to Supplement 1-5 and 7-25; and Hearing Exhibits 16, 18-22, and the DVD.

U.S. BANK'S MOTIONS FOR SUMMARY JUDGMENT

*Introduction*

Kelly asserts claims against U.S. Bank for violations of the Real Estate Settlement and

Procedures Act; Conspiracy, Fraud, and Racketeering[4]; and Gender Discrimination.

*Factual Background*

This action relates to three loan transactions between U.S. Bank and Kelly.  First, on March 14, 2003, U.S. Bank loaned Kelly $212,000 in conjunction with the refinance of her residential property ("the residential loan"), located at 5109 N.E. Ainsworth Street, Portland, OR, 97218 ("the residential property").  (Petrey Decl.  ¶ 2.)  This loan is secured by the trust deed of the residential property.  U.S. Bank owns and services the residential loan and this loan is currently in default due to delinquent payments.  (Petrey Decl. ¶ 3.)  Second, at the same time as the residential loan was extended to Kelly, a loan ("the junior residential loan") in the amount of $53,000 was also extended to Kelly, also secured by the trust deed of the residential property.  (Petrey Decl. ¶ 4; Petrey Decl., Ex. 1.)  This loan is junior to the first mortgage and has since been assigned to Mortgage Electronic Registration Systems, Inc. ("MERS").  U.S. Bank no longer owns or services the junior residential loan.  (Petrey Decl. ¶ 5; Petrey Decl. Ex. 2.)  Third, on May 22, 2003, U.S. Bank loaned Kelly $400,000 in connection with the refinance of Kelly's commercial property ("the commercial loan"), located at 3151 N.E. Sandy, Boulevard, Portland, OR, 97232 ("the commercial property").  (Bennett Decl. ¶ 2.)  This loan was secured by the trust deed to the commercial property.  (Loiselle Decl. ¶ 2.)

In May 2006, Kelly stopped making payments on the commercial loan which was subsequently transferred to U.S. Bank's Special Assets Group.  (Bennett Decl. ¶ 3.)  According to Todd Bennett ("Bennett"), "a Vice President in the Special Assets Group ("SAG") of U.S. Bank

---

[4] Bishop, White and Marshall and Krista White are also named as defendants and are referred to in the Conspiracy, Fraud, and Racketeering claim.

National Association," Kelly admitted "that she had no means to cure the default on the [c]ommerical [l]oan, other than to sell the [c]ommercial [p]roperty . . . [and she] eventually sold the [c]ommercial [p]roperty and repaid the [c]ommercial [l]oan from the proceeds of the sale." (Bennett Decl. ¶¶ 1, 3.) On August 31, 2006, Kelly sent a letter to Bennett regarding the commercial loan and argued that where a loan is fraudulently induced by a lender, "some or all of the debt may be cancelled." (Bennett Decl., Ex. 1 at 3.) Subsequently, Kelly emailed Bennett and "request[ed] that the debt be completely zeroed out because there is no such thing as a debt . . . ." (Bennett Decl., Ex. 2 at 2.) U.S. Bank rejected this proposal on September 20, 2010. (Bennett Decl. ¶ 5.) Kelly also requested that U.S. Bank calculate the losses incurred by Kelly as a result of the interest rate increases on her commercial loan. (Bennet Decl., Ex. 2 at 1.)

On October 12, 2006, Sabrina P. Loiselle ("Loiselle") sent Kelly a letter and enclosed copies of documents associated with the commercial loan, namely, the note, trust deed, loan agreement, and payment history. (Loiselle Decl. ¶ 3; Loiselle Decl. Ex. 1.) On October 15, 2006, Kelly demanded, via letter, that Loiselle produce the originals of the note, all agreements between U.S. Bank and Kelly, and the "general ledger of 'U.S. Bank'" for inspection at the offices of Miller Nash LLP. (Loiselle Decl., Ex. 2 at 1.) Loiselle responded to Kelly's request in an October 23, 2006, letter which stated that "U.S. Bank [would] make its files concerning [Kelly's] loan(s) available for review at this firm's office." (Loiselle Decl., Ex. 3 at 1.) The letter also informed Kelly that U.S. Bank was accelerating her obligations under the commercial loan and warning that a foreclosure action was imminent if Kelly failed to satisfy the terms of the acceleration.

On November 2, 2006, Loiselle sent another letter to Kelly. The letter stated that U.S. Bank had made its loan files available to Kelly at the law offices of Miller Nash LLP and that Kelly had

failed to show up for an appointment she had made to personally view the documents. (Loiselle Decl., Ex. 4 at 1.) The letter also stated that Loiselle could not "provide or send to [Kelly] the original Note, Term Loan Agreement dated May 22, 2003, between [Kelly] and U.S. Bank or the Oregon Trust Deed that secures the Note because the outstanding obligation [was] not fully satisfied." *Id.* at 2.

On July 17, 2007, Kelly sent a letter to officers of U.S. Bank demanding "original certified true copies" of the bank's ledger and the promissory note, with respect to the residential loan, as well as "PROOF that [her] signature was not used to create new debt" and "PROOF that credit as debt is not the monetary system of the United States . . . ." (Bennett Decl., Ex. 4 at 4.)

U.S. Bank hired Bishop, White & Marshall P.S. ("Bishop White"), a law firm, "to commence a nonjudicial foreclosure action" on the residential property. (Weibel Decl. ¶ 2.) This action was cancelled after Kelly "paid a portion of the delinquency on the [residential] loan . . . ." (Weibel Decl. ¶ 2.) On June 11, 2008, Kelly sent a demand letter to U.S. Bank requesting certified copies of U.S. Bank's general ledger, all contracts between Plaintiffs and U.S. Bank, and the original note securing the residential loan. (Weibel Decl., Ex. 1.) This letter was forwarded to David Weibel ("Weibel"), a member of Bishop White. In response, Weibel sent Kelly copies of the deed of trust, the promissory note, her payment history, and a reinstatement quote associated with the residential loan. (Weibel Decl., Ex. 2.)

*Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008). Summary

judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)

(internal quotation marks omitted).

*Discussion*
*Motion for Summary Judgment I*

I.    Plaintiff Olstad is not a Real Party in Interest

As a preliminary matter, U.S. Bank argues that Olstad is not properly a party to this action

because he is not a real party in interest.  Under the Federal Rules "[a]n action must be prosecuted

in the name of the real party in interest." FED. R. CIV. P. 17(a).   U.S. Bank argues that, because

Kelly is the sole obligor and Olstad was not a borrower on either the residential or commercial loans,

Olstad has no legal interest in the claims brought by Kelly against U.S. Bank.

Plaintiffs argue that Olstad has standing because Kelly's financial situation bears directly on

Olstad's and he will suffer imminent harm if U.S. Bank forecloses on the residential property.

Plaintiffs also argue that Olstad has standing with specific regard to the judicial foreclosure claim

because an interest was deeded to him prior to initiation of the lawsuit and a foreclosure would

materially affect his rights in the residential property.

The court agrees that Olstad has standing with respect to the residential property.  Plaintiffs

submitted a record of Kelly's conveyance of the residential property to herself and Olstad as "tenants

by the entirety with rights of survivorship."  (Plaintiffs' Ex. 3.)   Accordingly, Olstad has a

substantive legal interest in the residential property and has standing with respect to the foreclosure

counterclaim and to the extent that his ownership interest is otherwise at stake.

II.    Real Estate Settlement Procedures Act

Kelly's complaint alleges that U.S. Bank violated the provisions of the Real Estate Settlement

and Procedures Act ("RESPA") by failing to appropriately respond to approximately fifty qualified written requests ("QWR") regarding a loan serviced by U.S. Bank.  Specifically, the complaint alleges that U.S. Bank failed to timely respond to the QWRs, failed to correct Kelly's account, unlawfully reported to credit reporting agencies that the loan was overdue, refused to cease collection efforts, and failed to conduct an appropriate investigation upon receipt of the QWRs.  (Complaint ("Compl.") ¶¶ 13-17.)  This conduct, Kelly alleges, "constituted a pattern of noncompliance[.]" (Compl. ¶ 18.)  The complaint does not specify whether these requests concerned Kelly's commercial or residential loans.

U.S. Bank argues that it is entitled to summary judgment on Kelly's RESPA claim for several reasons:  none of Kelly's correspondence with the bank qualifies as a QWR; the alleged QWRs relate only to the commercial loan and RESPA does not apply to commerical loans; Kelly does not identify what specific correspondence acted as a QWR; U.S. Bank was nonetheless responsive to Kelly's request and made documents available to her; and Kelly has not alleged and cannot prove actual damages arising from U.S. Bank's alleged failures.  Kelly responds that her correspondence with U.S. Bank does include several QWRs, examples of which  are presented in Appendix A to Plaintiffs' response materials.

The duty of a loan servicer to respond to borrower inquiries under RESPA is governed by 12 U.S.C. § 2605(e).  To constitute a QWR, the inquiry must be a "written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer," and must adequately identify the name and account of the borrower and "include[] a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provide[] sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C.

FINDINGS AND RECOMMENDATION        22                              {KPR}

§ 2605(e)(1)(B) (2010).  The lender must acknowledge receipt of this request within twenty days.

12 U.S.C. § 2605(e)(1)(A).  Within sixty days of receipt, the loan servicer

> must take one of the following steps:  (1) make any necessary corrections and notify the borrower; (2) after investigation, send a written explanation to the borrower that explains why the servicer believes the account is correct; or (3) after investigation, provide the requested information, "or an explanation of why the information requested is unavailable or cannot be obtained by the servicer."

*Kee v. Fifth Third Bank*, No. 2:06-CV-00602-CW, 2009 WL 735048, at *3 (D. Utah Mar. 18, 2009)

(quoting 12 U.S.C. § 2605(e)(2)).  The type of information sought by the borrower must be "related

to the servicing of [the] loan[,]" 26 U.S.C. § 2605(e)(1)(A), where servicing means "receiving any

scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making

payments of principal and interest and such other payments with respect to the amount received from

the borrower as may be required pursuant to the terms of the loan."  *Kee*, 2009 WL 735048 at *3.

Furthermore, the protections of RESPA do not extend to commercial loans.  Under RESPA, a

"federally related mortgage loan" is a loan secured by "residential real property."  12 U.S.C.

§ 2602(1)(A).

U.S. Bank argues that none of Kelly's contacts with U.S. Bank constitute a QWR because

none of the contacts relate to servicing the residential loan.  As above, servicing refers to the bank's

receipt of payments and the making of payments of principal and interest consistent with the terms

of the loan.  As U.S. Bank wrote:  "the allegations of market manipulation, improper securitization,

and fraud repeated in Kelly's correspondence to U.S. bank and complaints to various agencies and

officials do not constitute accounting errors" falling within the protections of RESPA.  (Defendant's

Memorandum 7.)  Furthermore, U.S. Bank argues, inquiries as to the underlying validity of the loan

and mortgage documents do not constitute QWRs for purposes of RESPA.

FINDINGS AND RECOMMENDATION        23                          {KPR}

The court has reviewed the contents of Appendix A to determine if any of the communications therein constitute QWRs.[5]  On February 21, 2004, Kelly wrote a letter to Jerry Grundhoffer ("Grundhoffer") of U.S. Bank offering to sell U.S. Bank some of her art, or produce art on a commissioned basis.  (Appendix A ("App.") 2.)  On March 18, 2004, Kelly again wrote to Grundhoffer, informing him that if U.S. Bank does not purchase her art in satisfaction of her loans, she will default on her loans in April 2004.  (App. 1.)

In May 2006, Kelly received an email from Mark Yee ("Yee"), a Senior Vice President in Small Business Banking at U.S. Bank.  The email was in response to Kelly's letters regarding an adjustment to her interest rate on the commercial loan.  Yee stated that U.S. Bank was unable to reduce her interest rate to the rate she requested, but offered to fix her rate at the current market rate.  (App. 55.)  Shortly thereafter, Kelly was sent a past due notice as to her commercial loan.  (App. 54.)  The next day, U.S. Bank sent Kelly a notice of default on that loan.  (App. 53.)  On May 21, 2006, Kelly again wrote a letter to Grundhoffer regarding the commercial loan and made suggestions as to how the situation could be resolved.  (App. 47-48.)

On July 31, 2006, Kelly wrote U.S. Bank requesting that the bank address the "skyrocketing interest rates" on her commercial loan.  (App. 57.)  In an October 10, 2006, letter to U.S. Bank, Kelly demanded the production of documents related to the commercial loan as well as certified copies of "any and every contract and/or agreement(s) entered into in writing between [her]self and 'U.S. Bank'[.]"  (App. 63 (all caps in original).)  She also demanded an affidavit from every U.S. Bank employee with knowledge of Kelly and her account with U.S. Bank.

---

[5] Appendix A was submitted to the court without exhibit or page numbers.  The court numbered the pages as received and will refer to those page numbers as well as specifically identify each document in its analysis.

In June 2007, Kelly again wrote to U.S. Bank giving notice of the complaint she had filed against U.S. Bank with the Office of the Comptroller of the Currency.  She also demanded production of the bank ledger and promissory note, and proof that her signature had not been used improperly.  Kelly wrote again, on December 24, 2007, demanding production of those same documents.  In June 2008, Kelly sent a demand letter to U.S. Bank and Miller Nash LLP, demanding the production of documents and a forensic examination of those documents.  Finally, in June 2009, Kelly again wrote to U.S. Bank to give notice of her intent to sell the residential and commercial properties and requesting the bank's help in doing so.[6]

After reviewing these documents, the court concludes that none of the communications between Kelly and U.S. Bank constitute QWRs under RESPA.  The communications relate in large part to the commercial loan which is not covered by RESPA.  And, to the extent the communications relate to loans covered by RESPA, Kelly does not object to the manner in which U.S. Bank was servicing her loan.  Under RESPA, inquiries and challenges to the validity of the loan and the underlying documents are distinct from those that address the servicing of the loan.  *See MorEquity, Inc. v. Naeem*, 118 F. Supp. 2d 885, 901 (N.D. Ill. 2000) ("According to the allegations of the counterclaim, the letter sought information about the validity of the loan and mortgage documents, but made no inquiry as to the status of the Naeem account balance. Therefore, the request did not relate to 'servicing' of the loan, and Count V fails to state a claim under § 2605.")  As U.S. Bank argues, RESPA's scope does not extend to allegations of market manipulation, improper securitization, or fraud.  Therefore, because Kelly's inquiries were not those within the scope of

---

[6] The rest of the documents in Appendix A are communications between Kelly and other entities other than U.S. Bank, articles about the financial system in general, or fax cover sheets that do not bear on the QWR issue.

RESPA and did not constitute QWRs, U.S. Bank's duty to respond was never triggered and U.S. Bank is entitled to summary judgment on this claim.

III.    Second Claim for Relief

Kelly's second claim for relief is titled "Conspiracy, Fraud and Racketeering" and contains several subsections.    Some of the subsections state separate claims and some give general background to the fraud and conspiracy claims.

A.    Racketeering Claims:  RICO and ORICO – Sections D and H

Section D, "Securitization as Racketeering" alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  Kelly's theory of liability is that by relaxing lending standards and extending residential loans to non-creditworthy applicants, U.S. Bank and others conspired to drive up real estate values to inflated levels.  These conspirators then bundled these mortgages and sold them as mortgage-backed securities with the knowledge that many of these borrowers would default on their residential loans, at which time the conspirators would foreclose on these properties with the intention of gaining an ownership interest in residential real estate. Furthermore, by reducing lending standards the conspirators were able to generate many new residential mortgages which acted as the raw material for the mortgage-backed securities that they subsequently sold.

In the context of RICO, Plaintiffs allege that the "enterprise" is made up of "the originator, the sponsor/issue, the trustees and the intermediary bank[.]" (Compl. 11.) The predicate acts include mail and wire fraud in making and communicating misrepresentations regarding the securitization process, false disclosures and non-disclosures to borrowers, and false representations regarding the value of collateral.  As to intent, Kelly alleges that "[t]he requisite 'intent' is evident in the

knowledge . . . , acts, omissions, purpose . . . and results of securitization." (Compl. 11.) Kelly also alleges a claim under the Oregon Racketeer Influenced and Corrupt Organizations Act ("ORICO") in Subsection H of the second claim based on the same allegations as the RICO claim.

U.S. Bank moves for summary judgment on the RICO and ORICO claims because the claims lack a basis in fact. U.S. Bank argues these claims lack a basis in fact because they are premised on the sale and securitization of the residential loan and the loan was never sold or securitized. The court agrees that Kelly has failed to meet her burden at summary judgment with regard to claims arising under RICO and ORICO. These claims are premised on the predicate act of securitization. Kelly has failed to present any evidence that the residential loan was securitized. U.S. Bank, on the other hand, has produced substantial evidence that it currently owns and services the residential loan. Accordingly, summary judgment should be granted as to these claims.

B.    *Fraud – Section A*

Section A of Plaintiffs' second claim for relief alleges fraud and again relies upon Kelly's theory regarding the securitization of mortgages. U.S. Bank argues that the fraud claim is barred by the statute of limitations. In Oregon, an action based on fraud must be commenced within two years of the date the fraud was discovered. *See* OR. REV. STAT. 12.110(1) (2009) ("An action for assault, battery, false imprisonment, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years; provided, that in an action at law based upon fraud or deceit, the limitation shall be deemed to commence only from the discovery of the fraud or deceit.") Fraud is "discovered" for purposes of this rule when "the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three

elements (harm, causation, and tortious conduct) exists."  *Gaston v. Parsons*, 318 Or. 247, 256 (1994).

U.S. Bank argues that, based on statements in the complaint, Kelly admits that she became aware of the fraudulent scheme in 2005, more than two years prior to the filing of this lawsuit.  In fact, the complaint states: "Beginning in late 2005, the conspiracy alleged in paragraphs 9-16, above, had become apparent to Kelly . . . ."  (Compl. ¶ 67.)  The complaint was originally filed in state court on November 3, 2008.  Regardless of when in 2005 Kelly became aware of the alleged conspiracy, the date of filing is outside of the applicable statute of limitations and, thus, the fraud claim is barred.  Accordingly, summary judgment should be granted on this claim.

     C.     *Sections B, C, E, F, and G*

Several subsections of the second claim describe generally issues of securitization, tax evasion, and antitrust violations, without specific reference to the facts of this case.  Section B, "General Allegations – Securitization," describes the process of securitization of mortgages and sets forth Kelly's theory:  "[Kelly] believe[s] and therefore allege[s] that, after the securitization of the underlying obligation, neither the Originator nor the Servicer have the authority to request the Trustee to foreclose the Deed of Trust."  (Compl ¶ 37.)

Section C, "Securitization as Fraud," describes Kelly's theory as to how securitization creates an unlawful conflict of interest when the originator of the loan also acts as the servicer resulting in conversion and fraud.  Kelly alleges damages incurred by both investors and "all real property owners[.]"  (Compl. ¶¶ 38, 41.)

Section E, "Securitization as Monopolization," alleges that the securitization process violates federal antitrust laws.  Section F, "The Use of Void Contracts," describes how securitization uses

"void contracts" because such contracts are "unilateral, executory contracts for which there is no consideration, illusory promises respecting collateral that has not been acquired or performed and contracts devoid of mutuality . . . ."  (Compl. ¶ 45.)

Section G, "Tax Evasion," alleges that certain types of securitization amount to tax evasion because the originator can manipulate the price of the collateral and, thus, avoid taxes on capital gains.  Kelly asserts that this is "void as against public policy."  (Compl. ¶ 48.)

These sections do not contain any facts or allegations specific to U.S. Bank, except to the extent that securitization was enabled and transacted by "a consortium of private banks to which US Bank belongs."  (Comp. ¶ 29.)

> D.    *Specific Allegations Regarding U.S. Bank – Section I*

Section I of the second claim contains allegations specific to this action and are as follows. In 1999, Kelly purchased the residential property with a loan from U.S. Bank secured by the residential property.  Regular payments on this loan were made until June 2008.  In November 2007, Kelly began to demand that the bank, as well as Bishop White, prove that U.S. Bank held the note secured by the deed of trust on the residential property.  According to Kelly, none of these defendants "ever provided copies of any of the documents, an opportunity to examine any of the documents, or acknowledged that any of the documents demanded in the various communications from plaintiff Kelly even exist."  (Compl. ¶ 60.)  Thus, Kelly alleges "[o]n information and belief," that the residential mortgage has been securitized and is no longer owned by U.S. Bank.  Even so, U.S. Bank intends to foreclose on the residential property and has so intended since November 12, 2008. (Compl. ¶ 62.)

//

FINDINGS AND RECOMMENDATION         29                              {KPR}

E.      *Analysis*

Kelly's specific allegation against U.S. Bank with regard to securitization is that, upon the alleged securitization of her residential loan, U.S. Bank ceded ownership of the loan and, thus, cannot initiate foreclosure on the associated property.  Kelly, however, provides no evidence to support her allegation that the loan was securitized.  Rather, the record evidence submitted by both parties reveals substantial evidence that U.S. Bank owns and services the mortgage on Kelly's residential property.

As a general matter, the bulk of the allegations in the complaint and the bulk of the evidence submitted by Kelly address the legality of the securitization process itself.  This issue, as presented by Kelly, is simply beyond the purview of this court.  As the court's analysis of the motion to strike suggests, the materials that address the actions of banks and the operation of the financial sector as a whole are too broad and too general to ascribe liability under the specific facts of this case.  The court may address only specific factual allegations and evidence that U.S. Bank acted unlawfully with respect to Kelly and her residential mortgage.  Kelly has failed to present facts upon which a reasonable factfinder could conclude that U.S. Bank had acted in a fraudulent or otherwise unlawful manner with regard to Kelly and her mortgage.  On the materials before it, the court concludes that the general and unsupported allegations set forth in this claim are insufficient to survive summary judgment and this claim should be dismissed.

IV.     Gender Discrimination

Kelly alleges that U.S. Bank discriminated against her based on gender when it refused to renegotiate the terms of her commercial loan, forcing her to sell the commercial property.  In support of this contention, Kelly alleges that U.S. Bank extended a loan to the subsequent purchaser of the

commercial property, a man, "on exactly the same terms as those which [] Kelly had proposed in her attempt to renegotiate her purchase money loan with US Bank." (Compl. ¶ 73.) U.S. Bank argues that this claim should be dismissed because it was not filed within the statute of limitations and otherwise fails to state a plausible claim.

A.    *Statute of Limitations*

U.S. Bank points out that the complaint does not refer to a specific law or statute prohibiting this alleged discrimination, but surmises that the claim is brought under the Equal Credit Opportunity Act ("ECOA"). Under the ECOA, it is "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction [] on the basis of race, color, religion, national origin, sex or marital status, or age[.]" 15 U.S.C. § 1691(a)(1). A claim under this act must be brought within "two years from the date of the occurrence of the violation[.]" 15 U.S.C. § 1691e(f).

The court agrees that more than two years have elapsed since the alleged violation, when Kelly attempted to modify the terms of her loan. The evidentiary record reveals that U.S. Bank refused Kelly's request to modify the terms of her loan on September 20, 2006. (Bennett Decl., Ex. 3.) This action was originally filed on November 3, 2008, more than two years from the alleged violation. Accordingly, Kelly's discrimination claim is barred and summary judgment on this claim should be granted.

B.    *Failure to State a Claim*

Even if Kelly's claim were not barred by the statute of limitations, Kelly has failed to state a claim of gender discrimination under ECOA. Claims under ECOA are subject to a burden-shifting analysis similar to that which applies to claims under Title VII. *Miller v. Bank of America, N.A.*, No.

Civ.A. 01-1651(RMC), 2005 WL 1902945 (D.D.C. July 13, 2005).  Accordingly, to meet her prima

facie burden, Kelly must allege and prove:

> (1) she belongs to a minority or protected class,
> (2) she applied for and was qualified for a loan,
> (3) despite her qualifications she was rejected, and
> (4) males or married females of similar credit stature were given loans, or were
> treated more favorably than plaintiff in the application process.

*Gross v. United States Small Business Admin.*, 669 F. Supp. 50, 53 (N.D.N.Y. 1987) (citing *Sayers*

*v. General Motors Acceptance Corp.*, 522 F. Supp. 835, 839-40 (W.D. Mo. 1981), and *Cragin v.*

*First Fed. Sav. & Loan Ass'n*, 498 F. Supp. 379, 384 (D. Nev. 1980)).

As U.S. Bank states, at the time Kelly requested the loan modification, she was already in

default on the commercial loan.  (Bennett Decl. ¶ 3.)  A notice of default was sent to Kelly on May

11, 2006.  (App. A 53.)  On August 31, 2006, Kelly sent a letter to U.S. Bank, arguing that where

a loan is fraudulently induced by a lender, "some or all of the debt may be cancelled."  (Bennett

Decl., Ex. 1 at 3.)  On September 15, 2006, Kelly wrote an email to U.S. Bank "request[ing] that the

debt be completely zeroed out . . . ."  (Bennett Decl., Ex. 2.)  U.S. Bank declined Kelly's proposal

on September 20, 2006, in writing.  (Bennett Decl., Ex. 3.)  Thus, U.S. Bank argues, Kelly has not

alleged or otherwise met her burden of proof as to whether she was qualified for the loan

modification she requested.

The court agrees with U.S. Bank.  Based on the evidence in the record, it would not be

reasonable to conclude that Kelly was qualified for the modified loan terms she requested when she

was already in default on the loan, had suggested that the debt was fradulent and should be cancelled,

and had proposed "zeroing out" of her loan balance because there no such thing as debt.

Furthermore, although Kelly alleges that the purchaser of the commercial property was given

FINDINGS AND RECOMMENDATION         32                              {KPR}

a loan with the same terms she had requested, she has produced no evidence in support of that contention or of any gender based decision-making by U.S. Bank regarding her loan.  At summary judgment, Kelly's bare allegations and failure to produce a scintilla of evidence to support this contention are insufficient to meet her evidentiary burden.  For these reasons, Kelly cannot meet her prima facie burden and summary judgment should be granted in favor of U.S. Bank.

V.    Declaratory Relief

Plaintiffs also claim entitlement to declaratory relief.  Plaintiffs ask the court to declare that U.S. Bank, having acquired its interest in Plaintiffs' real property through illegal means, is not the true owner of the obligation and, therefore, cannot foreclose on the residential property.  Plaintiffs further claim that the only appropriate remedy is an injunction to prevent U.S. Bank from foreclosing until it can prove its entitlement to foreclose.

For the reasons discussed above, Kelly has not presented evidence upon which the court could reasonably conclude that U.S. Bank's interest in the residential property was acquired through illegal means.  Accordingly, Plaintiffs' request for declaratory relief should be denied.

*Motion for Summary Judgment II – Foreclosure Claim*

U.S. Bank has alleged a foreclosure counterclaim and seeks summary judgment on its foreclosure counterclaim because, in its view, there are no genuine issues of material fact regarding Kelly's obligation and default under the loan.  Kelly has not filed any substantive opposition materials in response to this motion.  U.S. Bank's Concise Statement of Material Fact has no opposition and, thus, all facts therein are deemed admitted.  For purposes of judicial economy, those facts are reproduced in their entirety below, with only minor editing.

//

FINDINGS AND RECOMMENDATION        33                                {KPR}

I.    Factual Background

On or about March 13, 2003, Kelly executed and delivered to U.S. Bank National Association a promissory note in the original principal amount of $212,000 (the "note"). (Bennett Foreclosure Declaration ("Bennett Forecl. Decl.") ¶ 2, Ex. 1.) Kelly is in default under the note for failing to make payments in full when due and for failing to pay property taxes. (Bennett Forecl. Decl. ¶ 3.) The note provides, among other things, that if Kelly fails to make a payment in full when due, U.S. Bank may declare the entire balance of the note immediately due and payable. (Bennett Forecl. Decl. ¶ 2, Ex. 1.)

Pursuant to that provision, U.S. Bank has elected to declare the entire amount of principal and interest owing under the note immediately due and payable. (Bennett Forecl. Decl. ¶ 4.) There is now due, owing, and immediately payable to U.S. Bank under the note the principal amount of $197,146.04, plus accrued and unpaid interest as of November 23, 2009, in the amount of $25,975.91, plus interest accruing thereafter on the principal amount at a rate of 5.5 percent per year until paid. (Bennett Forecl. Decl. ¶ 5.) U.S. Bank has performed all conditions precedent on its part to be performed under the note. (Bennett Forecl. Decl. ¶ 6.)

On or about March 13, 2003, to secure repayment of the note, Kelly executed and delivered to U.S. Bank a trust deed (the "trust deed"). (Bennett Forecl. Decl. ¶ 7, Ex. 2.) The trust deed covers real property located at 5109 N.E. Ainsworth Street, Portland, Oregon, i.e., the residential property. (Bennett Forecl. Decl. ¶ 7, Ex. 2.) The trust deed was recorded on March 20, 2003, in the official real property records of Multnomah County, Oregon, as Instrument 2003-062638. (Bennett Forecl. Decl. ¶ 7, Ex. 2.) According to the trust deed, upon Kelly's default under the note or the trust deed, U.S. Bank, as beneficiary under the trust deed, may elect to foreclose the trust deed. (Bennett Forecl.

Decl. ¶ 7, Ex. 2.)  Kelly is in default under the trust deed for failing to make payments in full under the note when due and for failing to pay property tax payments when due.  (Bennett Forecl. Decl. ¶ 3.)

Kelly has claimed or may claim some right, title, interest, lien, or claim in the residential property. Any right, title, interest, lien, or claim by plaintiffs in the residential property, or any portion thereof, is subsequent, subject, and inferior to U.S. Bank's interest because of the trust deed. Third-party defendants City of Portland, Mortgage Electronic Registration Systems, Inc. ("MERS"), Credit Card Receivables Fund Incorporated ("Receivables Fund"), and ZB Limited Partnership ("ZB") have claimed or may claim some right, title, interest, lien, or claim in the residential property. Any right, title, interest, lien, or claim by Portland, MERS, Receivables Fund, and ZB in the Property, or any portion thereof, is subsequent, subject, and inferior to U.S. Bank's interest because of the trust deed.  (Bennett Forecl. Decl. ¶ 10, Ex. 3.)  There are no other proceedings at law or otherwise for the recovery of the debt owed under the note.  (Bennett Forecl. Decl. ¶ 11.)

Under the note and trust deed, U.S. Bank is entitled to all expenses incurred in pursuing its remedies under the note and trust deed, including reasonable attorney fees and costs. (Bennett Forecl. Decl. ¶ 7, Ex. 2.)  U.S. Bank is also entitled to recover any amounts advanced to protect its interest in the residential property.  (Bennett Forecl. Decl. ¶ 7, Ex. 2.)  U.S. Bank has incurred a number of costs in protecting its interest in the residential property and pursuing its remedies under the trust deed, including, but not limited to, $23,064.66 in past-due property taxes to redeem the residential property from a tax foreclosure proceeding instituted by Multnomah County, and $693 for a judicial foreclosure guarantee.  (Bennett Forecl. Decl. ¶ 8.)  U.S. Bank may incur additional costs, including additional property tax payments, as property taxes are currently due and owing for the tax years of

2007, 2008, and 2009.  (Bennett Forecl. Decl. ¶ 8.)

II.    Foreclosure

Oregon law provides:

Transfers in trust of an interest in real property may be made to secure the performance of an obligation of a grantor, or any other person named in the deed, to a beneficiary.  Where any transfer in trust of an interest in real property is made pursuant to the provisions of ORS 86.705 to 86.795 to secure the performance of an obligation, a power of sale is conferred upon the trustee.  The power of sale may be exercised after a breach of the obligation for which the transfer is security . . . .

OR. REV. STAT. 86.710 (2009).  Thus, to the extent that a valid trust deed exists and default on the underlying note has occurred, foreclosure may be exercised by the grantor.

U.S. Bank has elected to pursue judicial foreclosure of this lien.  As provided by ORS 88.010, "a lien upon real or personal property . . . shall be foreclosed, and the property adjudged to be sold to satisfy the debt secured thereby by a suit."  Additionally, U.S. Bank seeks a judgment that includes the amounts spent by U.S. Bank to secure its interest in the property and exercise its remedies under the trust deed.

There is no genuine dispute that Kelly executed a trust deed, secured by the residential property, and has since defaulted under the terms of the note.  The trust deed provides that, upon default, U.S. Bank may foreclose on the trust deed.  Therefore, U.S. Bank is entitled to foreclose on the trust deed and sell the property in order to satisfy the obligation under the note.

U.S. Bank further claims that its interest is superior to any interest claimed by Kelly or the third-party defendants.  "The general rule of priority in real estate interests is that a mortgage that is recorded first has priority over mortgages recorded subsequently." *Akins v. Vermast*, 150 Or. App. 236, 241, 945 P.2d 640 (1997) (citing OR. REV. STAT. 93.640(1)).  The trust deed was recorded in

Multnomah County on March 20, 2003. (Bennett Forecl. Decl., Ex. 2 at 1.) No other party to this action has established an interest in the residential property superior to that of U.S. Bank. Accordingly, U.S. Bank's motion for summary judgment on its foreclosure counterclaim should be granted.

Finally, U.S. Bank argues that, under the terms of the trust deed, it is entitled to recover attorney fees, costs, expenses, and disbursements. The trust deed indeed provides: "If the Note Holder has required [the borrower] to pay immediately in full as described above, the Note Holder will have the right to be paid back by [the borrower] for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees." (Bennett Forecl. Decl., Ex. 1 at 2.) U.S. Bank is entitled to an award of such expenses, under the undisputed terms of the trust deed.

*Conclusion*

For the reasons stated, U.S. Bank's Motion to Strike (#129) should be granted in part and denied in part; U.S. Bank's Motion for Summary Judgment (#51) should be granted; and U.S. Bank's Motion for Summary Judgment – Foreclosure Claim (#94) should be granted.

//

//

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due August 12, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy

of the objections.  When the response is due or filed, whichever date is earlier, the Findings and

Recommendation will go under advisement.

    DATED this 30th day of July, 2010.




                                        _____/s/ John V. Acosta_____
                                              JOHN V. ACOSTA
                                        United States Magistrate Judge